616 So.2d 1262 (1993)
Mark SMITH
v.
The CITY OF NEW ORLEANS and New Orleans Public Service Inc.
Brenda H. CATCHINGS, et al.
v.
STATE of Louisiana, DEPT. OF HIGHWAYS, et al.
Darryl BYNUM
v.
The CITY OF NEW ORLEANS, La. Dept. of Transportation, et al.
Thelma MATTHEWS
v.
NEW ORLEANS PUBLIC SERVICE INC., et al.
Nos. 91-CA-2185 to 91-CA-2188.
Court of Appeal of Louisiana, Fourth Circuit.
March 12, 1993.
Rehearings Denied May 12, 1993.
*1265 H. Muldrow Etheredge, and Vincent T. Lococo, New Orleans, for plaintiff-appellant/Mark Smith.
Carter B. Wright, Ogden, Ogden & Wright, New Orleans, for defendant/appellant/NOPSI.
Philip C. Ciaccio, Jr., Deputy City Atty., Kathy L. Torregano, Chief Deputy City Atty., William D. Aaron, Jr., City Atty., New Orleans, for defendant-appellant/City of N.O.
Miles G. Trapolin, M. Elizabeth Toca, Trapolin Law Firm, New Orleans, intervenor/appellee, Medical Center of Louisiana at New Orleans.
Vincent P. Blanson, Carl A. Butler, Bryan, Jupiter, Lewis & Blanson, New Orleans, defendant-appellant/The State of Louisiana, Dept. of Transp. & Development.
Jeffrey C. Collins, Metairie, for plaintiff-appellee/Brenda Catchings.
Timothy K. Lamy, Barker, Boudreaux, Lamy & Foley, New Orleans, for plaintiff/appellee/Thelma Matthews.
John P. Campbell, III, Metairie, for plaintiff-appellee/Darryl Bynum.
Before SCHOTT, C.J. and BARRY, KLEES, BYRNES, and LANDRIEU, JJ.
KLEES, Judge.
This case arose out of an automobile accident which occurred at about 3:20 a.m. on July 16, 1985 when an automobile driven by plaintiff, Mark Smith, left the road and collided with a utility pole on the side of the road. Other plaintiffs are Darryl Bynum, a passenger in Smith's car, and the survivors of Dana Matthews and Ava Catchings, two young women who were passengers in the car and were fatally injured. Defendants are the State Department of Transportation and Development (DOTD), the City of New Orleans, and New Orleans Public Service, Inc. (NOPSI). Third party demands were filed by each defendant against the others and against Mark Smith.
The case against NOPSI was tried to a jury. Simultaneously the case against DOTD and the city was tried to the judge. The jury allocated fifteen percent of the fault to NOPSI and fifty-five percent to Smith and assessed the amount of damages sustained by each of the four plaintiffs. The judge allocated twelve percent of the fault to each of the three defendants and sixty-four percent to Smith, and made his own damage assessments. Two judgments were rendered by the trial court.
All the defendants have filed suspensive appeals, and Mark Smith has appealed devolutively. The principal issues are whether NOPSI and the city had a duty to Smith and his passengers as to the location of the utility pole, whether the state breached its duty to them, and whether the pole constituted an unreasonable risk of harm to plaintiffs.
The accident occurred on the northbound side of North Broad Street, also designated as State Highway 90, in the City of New Orleans between Benefit Street and Interstate Highway 610. At this point the southbound side of North Broad is separated from the northbound side by two city blocks. Consequently, all references to North Broad or Broad Street in this opinion relating to the site of the accident are understood to mean the northbound side. North Broad Street was twenty-eight feet wide and contained a dashed stripe dividing two lanes. As Broad approached Benefit, it connected to an entrance ramp to the interstate, and from that point it made a forty-five degree turn toward the left from a northeast to a north direction. The curve ended between Benefit Street and the elevated interstate highway. Approximately seventy-five feet north of Benefit Street and sixty feet south of the interstate was NOPSI's pole 1892. This was a round steel pole approximately five feet in diameter supporting electrical transmission lines. It was located on the east side of Broad eighteen inches from the curb. Just before the accident Smith was proceeding along Broad *1266 Street past the interstate ramp and around the curve to Benefit when his automobile left the road and struck utility pole 1892.
This electrical transmission line was installed about 1965 before the present street configuration took shape. At that time the poles were located alongside Allen Street, which was a typical residential street in New Orleans to the east of and parallel to Broad Street. In 1973, Interstate 610 was under construction, and the northbound side of Broad Street or Highway 90 was rerouted to the east where it would lead to the entrance ramp of the interstate and continue with the curve to the north as previously discussed. What was previously Allen Street became the northbound side of North Broad or Highway 90. A number of modifications were done in the area. For example, electrical pole 1893, the next one to the south of pole 1892, was moved to make way for the entrance ramp of the interstate. Also, a bus turnaround was installed off Highway 90 between pole 1892 and Benefit Street. However, no significant change was made in the Allen Street roadway in front of pole 1892. At this point the street was essentially replaced in the same position.
In 1984, the city received a complaint from a citizen about the number of accidents in this vicinity with the request that a flashing light be installed in the approach from the south. The city conducted an investigation and recommended to DOTD that warning signs of the approaching curve be installed to its south with a speed advisory of thirty miles per hour. DOTD approved these suggestions, and they were carried out in March 1985. The statutory speed limit was thirty-five miles per hour.
Exactly what caused the accident is not known. Obviously Smith lost control of his automobile, and there is evidence of excessive speed. Smith was unable to recall anything about the accident. Bynum testified that as they were rounding the curve they hit a bump in the street and drove into a post. He stated Smith was driving like a "normal person", but he did not know how fast he was going. His testimony of a bump in the road arguably gained some corroboration from a report produced by DOTD at the very end of the trial that a New Orleans police officer reported a missing drain cover in the vicinity of Broad and Benefit Streets at 8:27 (morning or evening not indicated) on the day of the accident. The report does not specify whether the manhole was on the northbound or southbound side of Broad. However, there is a manhole cover near the scene of the accident on the left side of the right lane of Broad Street at the intersection with Benefit Street. The police officer who investigated the accident within an hour after it happened did not report an uncovered manhole. The trial judge did not address the issue of the open manhole in his reasons for judgment. However, he concluded that the configuration of the roadway, the lack of additional signs or signals, and the placement of the pole collectively imposed liability on DOTD, the city, and NOPSI along with Smith. The trial judge further found that the frequency of accidents at this location was also a significant factor in imposing liability.
Plaintiffs showed that approximately ten accidents had occurred in this vicinity between 1981 and 1985, with several of these specifically involving the pole in question. Photographs of the pole introduced into evidence show it to be very scratched and generally battered. Whether this evidence indicated a frequency of accidents was a question of fact for the trial court to determine.
On the signage or signal issue, the evidence established that as Smith approached the curve he was confronted by a thirty-five mile speed limit sign, two turn signs and thirty mile speed advisory signs and a dashed center stripe between lanes. Plaintiff established that there could easily have been more signs and signals to provide more "positive guidance" for drivers negotiating the curve, such as "chevron" signs around the curve, some sort of reflectors along the curb, and even flashing signals ahead of the curve. The signs had just recently been upgraded before the accident following the citizen's complaint, and both city and DOTD officials testified the situation would be monitored to determine *1267 whether the new signs would be effective and that more would be added if warranted. However, the present accident occurred before such monitoring could take place.
On the issue of the placement of the pole eighteen inches from the roadway, the record establishes that this distance was within the prevailing standard for an urban highway within the City of New Orleans. Plaintiffs showed, however, that the standard was a minimum of six feet in 1973 when the modifications relating to the interstate were made, but because there was no new construction at the place where this pole was located, its relocation was not required. Plaintiffs also established that there was room in the state's right-of-way to move the pole twelve feet over, and that technical electrical considerations would allow this movement. Finally, plaintiffs offered evidence to prove that the pole could have been made more "forgiving" by the installation of water barriers or a barricade.
With these facts in mind, we turn to the question of liability as to each party, starting with NOPSI. Plaintiffs had the burden of proving that NOPSI had some duty to move its pole away from the highway. It established that the pole was originally located eighteen inches from the curb in 1965 and was in the same place in 1985. This placement was in accordance with all applicable standards. The road in question was a state highway under state control. As one NOPSI official put it, the state had the power to require the pole's removal. A state official acknowledged that the state has this power. Plaintiff produced a letter written by NOPSI to the state in 1973 in which NOPSI agreed to move pole 1893, but said they would not move pole 1892 (the pole in question). The state apparently did not question NOPSI's decision at that time. NOPSI has no traffic engineers and makes no studies as to traffic conditions around its poles. It relies on the city or state to do this. If the configuration of the curve was made dangerous by the location of the pole, it was the state's duty to require the relocation of the pole. NOPSI had no independent duty to do so, and the trial court erred in finding one.
The same reasoning applies to plaintiffs' argument that NOPSI's pole should have been more "forgiving". It is the state's duty to make its highways safe for the public. This duty extended to the installation of attenuators in front of the pole if traffic circumstances required it. Relative to this issue is the lack of notice NOPSI had as to the alleged danger of the pole's location. The only notice NOPSI ever had about any problems with the pole was a citation and petition served on it in a suit filed by parties injured in a May 1984 accident at the same location. However, this service was made just three months before the present accident and cannot constitute sufficient notice to require NOPSI to take any action before the present accident, especially considering that the previous accident had involved an intoxicated speeding driver. We therefore have determined that the trial court erred in finding NOPSI liable and have resolved to reverse the judgment against NOPSI.
This conclusion is not in conflict with Vigreaux v. Louisiana Department of Transportation & Development, 535 So.2d 518 (La.App. 4th Cir.1988), writ denied, 540 So.2d 329 (1989). In that case, this court reversed a summary judgment in NOPSI's favor because there were genuine issues of material fact precluding summary judgment. The court recognized that it was "conceivable" that plaintiff could prevail. The present case comes to this court after a lengthy, full-blown trial in which the plaintiffs failed to establish NOPSI's liability as a matter of law.
As to the city, we reach the same conclusion. The trial court's finding that the combination of the road's configuration, the lack of signs and other devices, and the location of the pole constituted an unreasonable risk of harmalthough correct and supported by the evidenceis not a basis for the imposition of liability on the city unless this condition resulted from a breach of the city's duty. The state, not the city, designed and built the road; therefore, the state alone is responsible for the *1268 configuration of the curve. As already discussed, the state is also responsible for the pole's location in relation to the curve. The city's only involvement was regarding the signs. It made the study and the recommendation based thereon to install the curve and speed advisory signs. Nevertheless, the final judgment call on whether to go with these signs or to install a flashing signal, a barricade, and/or chevrons was for the state, not the city, to make. As in NOPSI's case, we have concluded that the trial court erred as a matter of law in finding that the city owed a duty to plaintiffs the breach of which would support liability to them. We have thus resolved to reverse the judgment against the city.
Finally, we consider the liability of the state and of the driver, Mark Smith. Although DOTD is not a guarantor of the safety of travelers, it does have a duty to keep state highways and shoulders reasonably safe for non-negligent motorists. Sinitiere v. Lavergne, 391 So.2d 821, 824 (La.1980). This duty is the same whether considered from the standpoint of negligence under La.Civ.Code article 2315 or strict liability under article 2317. Bush v. State Through Louisiana Department of Transportation and Development, 542 So.2d 721, 723 (La.App. 4th Cir.1989). In the instant case, we agree with the trial judge's conclusion that the configuration of North Broad Street at the accident site, together with the location of the utility pole, created an unreasonable risk of harm and was a cause-in-fact of the accident. We also agree that the evidence of the prior accidents at this location in the several years leading up to this incident was sufficient to establish constructive knowledge of the defective condition such that DOTD had an obligation to discover the defect and re-configure the roadway to protect the public from injury. Expert testimony at trial indicated that injuries such as the ones in this case could have been prevented or at least minimized by moving the utility pole five to ten feet and installing an attenuating device. In addition, a solid line, chevrons in the curve and/or a flashing signal could have been in place to warn approaching vehicles of the dangerous curve. DOTD's failure to take any of these measures constitutes fault which, along with the primary fault of the driver, contributed to this accident.
DOTD's liability for the existence of an unreasonably dangerous condition is not excused by the fact that the driver was also negligent. See, i.e.: Sinitiere v. Lavergne, supra; Rue v. State Department of Highways, 372 So.2d 1197 (La.1979); Rochelle v. State Through Louisiana Department of Transportation & Development, 570 So.2d 13 (La.App.3d Cir.1990), writ denied, 572 So.2d 93 (La.1991). Up to the site of this accident and beyond, North Board Street is an urban boulevard with curbs. To accommodate the bus "turn around", the curb had to be eliminated so that a bus traveling in the same direction of the Smith vehicle could enter the "turn around" and pass the pole on the driver's left side. Vehicles properly completing the curve in question from the right hand lane would be guided by the right curb line and pass the pole on the driver's right side.
Because of the bus entrance and the lack of curb preceding and throughout that entrance, the pole in question presented an unreasonably dangerous condition to vehicles traveling in the right lane. A negligent driver could misconstrue the entrance to the "turn around" as part of the roadway and strike the unforgiving pole before realizing the error. Based on the facts of this case, we find DOTD's fault to be twenty-five percent (25%) of the total fault in causing the accident. This assessment of fault is further supported by our conclusion, already discussed, that DOTD, rather then NOPSI or the city, is the sole party ultimately responsible for the configuration of the highway.
We attribute the remainder of the fault in causing the accident, seventy-five percent (75%), to the driver Mark Smith. The accident occurred in a thirty-five mile per hour speed zone. Smith was warned of the curve by two signs which also warned him to reduce his speed. The evidence is without contradiction that Smith had almost completed the curve before he ran off *1269 the road. It also shows that his car left no skid marks or yard marks (which would be left by a vehicle which slid off the road). This leads to the conclusion that when he was just about to straighten his car, he simply ran off the road and into the post. He apparently took no evasive action and slammed into the pole at a high rate of speed.
Officer Schubert, who wrote the accident report, concluded that the accident could have been caused by the excessive speed of the vehicle, the inattentiveness of the driver in that he failed to maintain control of the vehicle on the roadway, and/or the driver's drinking while driving. There was no evidence that the driver was intoxicated, as his blood/alcohol level was not measured. However, Darryl Bynum, a passenger in the vehicle, indicated that he and Smith had been drinking beer prior to the accident. Officer Schubert also saw a beer bottle in the car. Bynum also testified that the vehicle hit a "bump" in the road before veering off into the pole.
On appeal, plaintiffs argue that the State's production, near the end of the trial, of a report of a missing drain cover in the vicinity of Broad and Benefit Streets on the day of the accident, corroborates Bynum's testimony and exculpates Smith from liability. Plaintiffs also argue that if they had been in possession of the report earlier, they might have been able to make a connection between the missing drain cover and the accident.
Although we find the State's conduct in neglecting to produce the report earlier to be inexcusable, we do not find that this evidence entirely exculpates Mark Smith. The report speaks of a missing drain cover at 8:27 on July 16th, which would be at least five and possibly seventeen hours after the accident, which occurred at 3:20 a.m. This report does not prove that the manhole shown in photographs of the accident site was uncovered at the time of the accident. Officer Schubert, who inspected the road looking for defects immediately after the accident, did not report a missing drain cover or an open manhole. Therefore, the evidence on the existence of an open manhole is inconclusive. Moreover, Darryl Bynum did not testify that the "bump" was of such a size or impact as to cause a reasonably prudent driver to veer off the road. Even so, the circumstantial evidence that there may have been a defect in the road in addition to the dangerous placement of the utility pole further supports our apportionment of twenty-five percent liability to DOTD in this matter. Considering the evidence as a whole, however, we find that the preponderance of the evidence supports our conclusion that Mark Smith's own negligence and inattentiveness was the primary cause of the accident that injured himself and Bynum and killed two other passengers. For this reason, we assign seventy-five percent of the liability to him.
Turning to the issue of damages, we note that this was a bifurcated trial in which the case against NOPSI was tried before a jury simultaneously while the case against the City and DOTD was tried before the judge. Accordingly, the jury and the trial judge made different findings as to the quantum of damages suffered by each party. We have recently held that, when a bifurcated trial results in inconsistent findings of fact by the trial judge and the jury, the appellate court should engage in an independent review of the facts in the record without according any weight to the factual findings of the judge or the jury. McCullough v. Regional Transit Authority, 593 So.2d 731, 734-36 (La.App. 4th Cir.1992), writ denied, 595 So.2d 655 (La.1992). As we noted in McCullough, this standard of review differs from that espoused by our colleagues on the First and the Third Circuits, who review the record in order to decide whether the judge or the jury made a more reasonable finding. Id. 593 So.2d at 735. Following our policy, we have examined the record and made our own findings with regard to the damages suffered by each party.
We consider first the damages suffered by Mark Smith, who sustained a severe head trauma including neck and skull fractures, multiple displaced fractures of the pelvis and hip, an ankle fracture and *1270 internal injuries, including a lacerated spleen which had to be removed. Smith was hospitalized for two and one-half months, and did not regain full consciousness until almost two weeks after the accident. His Charity Hospital bill is approximately $46,000.00. Moreover, the fracture to his hip is of a type that will probably necessitate a total hip replacement or hip fusion in the future. Dr. Bernard Manale, an orthopedic surgeon who saw Smith five times for purposes of evaluation, estimated Smith to have a permanent physical disability of at least forty percent. Dr. Manale stated that Smith was capable of sedentary work and some lifting.
Dr. C.B. Scrignar, a psychiatrist who evaluated Smith, opined that he had suffered some brain damage and memory loss as a result of the accident, although there are no diagnostic studies which show a definitive brain abnormality. Dr. Scrignar opined that Smith could be trained for some type of employment, although he would have some limitations.
Terrence Kennedy, a vocational rehabilitation expert, testified that Smith was totally and permanently disabled. In Kennedy's opinion, Smith is physically unable to do the work he knows and mentally unable to learn the tasks necessary to hold a new job.
Dr. Melville Wolfson, an economist, testified concerning Smith's possible lost wages. Prior to the accident, Smith worked at various minimum wage jobs. Dr. Wolfson estimated Smith's past lost wages to be approximately $44,000.00 and his future loss of earnings to be $260,000.00. This figure is based on the assumption that Smith will never work again.
Considering the evidence, we find Mark Smith to have sustained general damages, including medical expenses, pain and suffering, and past and future loss of earnings, in the amount of $600,000.00. We have arrived at this figure after closely considering the entire record, without giving any weight to the jury's assessment of $200,000.00 or the trial judge's assessment of $800,000.00.
We next consider the damages of Darryl Bynum, which the jury assessed at $200,000.00 and the trial judge at $385,520.00. The State argues that both figures are excessive for a knee injury such as the one sustained by Bynum. Bynum suffered a severe knee injury which required his hospitalization for approximately six months while he underwent several surgeries on his knee. He also had a cut tendon on his finger. His knee injury has left him with a limp, which causes back pain and spasms. He cannot fully bend or extend his knee, and has to swing his leg in order to move. His orthopedist, Dr. Dennis, testified that Bynum is unable to engage in any physical activity requiring the use of his left knee, such as prolonged walking, standing, stooping, climbing or squatting. He also stated that all the consequences of Bynum's knee injury have not yet developed, and that Bynum will eventually have more pain and require additional surgery. Dr. Dennis assessed Bynum's disability as a ninety percent impairment of the left lower extremity and a thirty percent impairment of the whole person.
At the time of the accident, Bynum was a nineteen-year-old busboy/dishwasher earning minimum wage. His aunt confirmed his testimony that he was a "slow learner" and had stopped school after completing the eighth grade. He attempted to return to his job after the accident, but was fired because of his leg. Bynum testified that he has tried to get another job, but has been unsuccessful because of his disability. His aunt testified that Bynum had become withdrawn and depressed, presumably because of his pain and his inability to work or engage in sports as he formerly did. There is no question that Bynum's injuries were completely caused by this accident.
The economist Dr. Wolfson calculated that Bynum had sustained $17,000.00 in lost wages up to the time of trial. He also assessed Bynum's loss of future earning capacity at somewhere between $105,000.00 (assuming Bynum could work part time at minimum wage throughout his life) and $380,000.00 (which takes into account normal raises and job changes and assumes Bynum can never work again).
*1271 In its brief, DOTD cites prior case law to show that damages awarded for a knee injury requiring surgery have ranged from $50,000.00 to $160,000.00. However, the distinguishing factor in this case that Darryl Bynum will probably never be able to perform manual labor again, which is the only work he is mentally capable of doing. The extensive testimony clearly shows that because of his physical disability, Darryl Bynum's whole outlook on life has changed. In view of this evidence, we find that Darryl Bynum is entitled to $375,000.00 in general damages.
Finally, we consider the amount of damages owed to the survivors of Ava Catchings and Dana Matthews, the two passengers who died in the accident. Ava Catchings was twenty-years-old and the mother of a fourteen-month-old child, Shanta Catchings. Shanta is entitled to recover for her mother's medical and funeral expenses (stipulated to be $3,237.10 and $4,220.92, respectively), her mother's pain and suffering, and the loss of her mother's love, affection and financial support. The evidence shows that Shanta and her mother had a normal close and loving relationship. Although Ava Catchings survived for approximately sixteen hours after the accident, she was unconscious and we find no credible evidence in the record that she suffered. Dr. Wolfson estimated that had Ava lived, she would have contributed approximately $147,000.00 in financial support and household services to her daughter Shanta. In view of this evidence, we find that Shanta Catching is entitled to an in globo award of damages in the amount of $250,000.00.
With regard to Dana Matthews, the evidence shows that she was a twenty-one-year old single female who was raised by her mother Thelma and was still living with her mother at the time of her death. The testimony of Dana's mother sister shows that Dana and Thelma enjoyed a very close and loving mother/daughter relationship. Based on the record, we find that Thelma Matthews is entitled to an award of $125,000.00 for the loss of her daughter's love, affection and companionship.
In making these damage awards, we note that the plaintiffs' rights of recovery are governed by Civil Code article 2324 as it existed before its amendment in 1987. This accident occurred in 1985, and this court has specifically held that the 1987 amendment to article 2324 dealing with comparative fault is not to be applied retroactively. Perez v. State, Through DOTD, 578 So.2d 1199 (La.App. 4th Cir.1991), writ denied, 581 So.2d 706 (La.1991). Under the prior version of that article, a joint tortfeasor is liable as a solidary obligor, except with regard to an obligee whose degree of fault is greater than his own, in which case the tortfeasor is liable for no more than the degree of his own fault, reserving to all parties their respective rights of indemnity and contribution. In the instant case, DOTD may be held liable to Mark Smith for no more than twenty-five percent of Smith's damages. The other plaintiffs, who are free of negligence, may enforce their judgments in full against the state as a solidary obligor. DOTD may then assert its own rights of contribution and/or indemnity against Mark Smith. The judgment against the state in favor of intervenor Charity Hospital of New Orleans for medical bills owed to it on behalf of Mark Smith, Darryl Bynum and Ava Catchings, recognizing Charity as being subrogated to the rights of each party in this regard and awarding the medical bills as part of the in globo awards of each party, remains intact.
Accordingly, for the reasons stated, we reverse the judgments against NOPSI and the City of New Orleans; we amend the trial court's judgment against the State of Louisiana to provide that the state's degree of fault is twenty-five percent (25%) and the degree of fault of plaintiff Mark Smith is seventy-five (75%), and that the damages awarded each plaintiff are as follows: Mark Smith, $600,000.00; Darryl Bynum, $375,000.00; Brenda Catchings, as provisional tutrix of Shanta Catchings, $250,000.00; and Thelma Matthews, $125,000.00.
*1272 In all other respects, the judgments are affirmed.
AFFIRMED IN PART, REVERSED IN PART, MODIFIED AND RENDERED.
SCHOTT, C.J., dissenting in part.
SCHOTT, Chief Judge, dissenting in part:
I concur with the majority's reversal of the judgments against NOPSI and the City of New Orleans. I respectfully dissent from their affirmation of any judgment against the State of Louisiana.
This accident happened in a thirty-five mile per hour speed zone. Smith was warned of the curve by two signs which also warned him to reduce his speed. The small number of previous accidents among over 8,400 passing motorists daily refutes his argument that he was entitled to more warnings and signals without which the curve was unreasonably dangerous.
The evidence is clear that Smith was going well over the speed limit and he simply ran off the road and into the pole. Under these circumstances it was incumbent upon him to prove he was not negligent in losing control of his car. Plaintiffs attempted to carry this burden with Bynum's testimony to the effect that as they were coming around the bend, they hit a bump in the street and drove into the pole. He could not say whether Smith was going thirty miles per hour or fifty and he did not say with any specificity that this bump was of such a size as to cause a reasonably cautious driver to lose control of his automobile and strike a pole eighteen inches from the road. As opposed to his testimony, the investigating police officer testified that he looked for defects in the road and found nothing that could have contributed to the accident. The trial judge provided extensive reasons for his judgment against the state and made no finding as to any bump or other such defect in the road which contributed to the accident.
In this court, plaintiffs argue that the report which surfaced only at the very end of the trial provided an inference that Smith lost control of his car because of an open manhole in the road. Only speculation would tie the report to the manhole in the northbound side of Broad at Benefit Street and to the time of Smith's accident. However, plaintiffs argue that had they been in possession of this report prior to trial they might have been able to make a connection between the report and the accident. They charge DOTD with deliberately concealing the report from them in spite of numerous discovery devices in response to which the report should have been disclosed.
I agree with plaintiffs that DOTD's conduct with respect to this report was reprehensible. But I do not agree that the outcome would have been any different no matter when the report was produced. This accident happened at 3:30 a.m. on July 16, 1985. The report speaks of a missing drain cover at 8:27. This would be either five or seventeen hours after the accident. This hardly supports the theory that the sewerage manhole cover at Broad and Benefit was missing at the time of the accident. In addition to this great discrepancy in time, Bynum's testimony of a bump hardly comports with the sort of impact that would result had Smith's automobile wheel gone into an open manhole. Finally, nothing would have been more obvious to the investigating officer than this open manhole had it been so. His purpose was to determine the cause of this fatal accident. This manhole was in the lane Smith had probably been in before he left the road and was just a short distance away. I do not accept as a reasonable probability the theory that the cover was missing, but the officer either failed to see this or saw it and failed to disclose it.
The trial judge heard the same arguments from plaintiffs regarding this report and DOTD's misconduct in failing to produce the report. It is obvious from the trial judge's reasons that he was not impressed with the report or plaintiffs' arguments. For the reasons above neither am I. Plaintiffs failed to provide a plausible explanation as to why Smith lost control of his automobile. He failed to carry this burden with Bynum's testimony because *1273 this was absolutely refuted by the investigating officer.
However, plaintiffs contend that DOTD is liable even if Smith's negligence was a cause of the accident. In support of this argument plaintiffs refer to a number of cases including Sinitiere v. Lavergne, supra; Rue v. State Dept. of Highways, 372 So.2d 1197 (La.1979); and Rochelle v. State through DOTD, 570 So.2d 13 (La.App. 3 Cir.1990), writ den. 572 So.2d 93, in each of which recovery was allowed for a motorist who inadvertently drove off the highway to a shoulder and suffered injury because of a rut in the shoulder. The court reached the same result in LeBlanc v. State, 419 So.2d 853 (La.1982). Each of these cases involved a defect in the shoulder of the road. One purpose of a shoulder on an open road is to provide a space off the traveled portion of the road for an emergency. In these cases this purpose of the shoulder was defeated. In each case the inadvertent motorist encountered a rut in the shoulder immediately adjacent to the road which rut caused him to lose control of his vehicle.
Unlike the cited cases which all involved open highways in rural areas the present case involves a city street. This is not the case of a defective shoulder, but a utility pole separated from the traveled portion of the street by eighteen inches and a curb. Plaintiffs' contention that the utility pole's proximity to the street created an unreasonably dangerous condition is analogous to the arguments advanced by plaintiffs in Bush v. State through La. DOTD, 542 So.2d 721 (La.App. 4th Cir.1989), and Marziale v. Maney, 529 So.2d 504, 506 (La.App. 4th Cir.1988). In these cases plaintiffs argued that DOTD breached its duty by failing to provide shoulders on bridges on Interstate 10 Highway in New Orleans. They argued that this was an unreasonable dangerous condition especially considering the volume of traffic and number of accidents and breakdowns. This court flatly rejected these contentions concluding that there was no breach of duty or an unreasonable risk of harm. In the present case plaintiffs are arguing in effect that a shoulder was required between the pole and the street to provide Smith with a safe haven having left the roadway. There is no precedent to support that argument.
This was an unfortunate accident with tragic consequences. But the law does not impose liability on DOTD for such an accident unless the highway is unreasonably dangerous. This utility pole's location was clearly within acceptable standards for a street or urban highway in the City of New Orleans. Indeed there are hundreds if not thousands of utility poles as close to curbs in the City. The fact than an accident occurred here or even that some modifications might have prevented the accident does not lead to the conclusion that this was an unreasonable risk of harm so as to make DOTD liable. This pole was in no way a cause of this accident. The sole cause was Smith's negligence. I would reverse the trial court completely and dismiss the suit in its entirety.