700 So.2d 913 (1997)
Rosie Mae King BOTELER, as Tutrix and on Behalf of the minors, Katie Ann Nea and Josie Virginia Nea
v.
Guillermo G. RIVERA, Louisiana Power and Light, Inc., State of Louisiana, and Department of Transportation and Development of the State of Louisiana.
No. 96-CA-1507.
Court of Appeal of Louisiana, Fourth Circuit.
September 17, 1997.
Rehearing Denied November 14, 1997.
*914 Eugene G. Taggart, Carter B. Wright, Monroe & Lemann, New Orleans, for Appellant Entergy Louisiana, Inc., formerly known as Louisiana Power & Light Company.
Charles A. Verderame, Giraud, Cusimano & Verderame, New Orleans, for Plaintiff.
Richard Ieyoub, Attorney General, Gregory G. D'Angelo, Special Assistant Attorney General, Panzeca & D'Angelo, Metairie, for Appellant Dept. of Transportation and Development.
Before LOBRANO, ARMSTRONG, PLOTKIN, LANDRIEU and MURRAY, JJ.
LOBRANO, Judge.
This case involves a single vehicle accident in which the guest passenger, Robin Reed, was killed. Decedent's two minor children filed suit against the driver of the vehicle, Guillermo Rivera, The Department of Transportation and Development (DOTD) and Entergy Louisiana, Inc., formerly Louisiana Power and Light Company (LP & L). After a judge trial, fault was apportioned at 45% to DOTD, 25% to LP & L, 15% to Rivera and 15% to Reed. DOTD and LP & L appeal.[1]
In the early morning hours of November 25, 1985 Robin Reed was a guest passenger in the vehicle driven by Rivera. Rivera was giving Reed a ride to her home in St. Bernard Parish. They were traveling along "old" Hwy. 46, known as Bayou Road, in an easterly direction when Rivera's vehicle left the hard surfaced portion of the highway and collided with a utility pole. A following motorist, Sal Bertucci, testified that Rivera's vehicle drifted off the road somewhere between 50 to 200 feet before striking the pole. Bertucci estimated the speed of Rivera's vehicle at 40 mph.
In extensive written reasons, the trial judge made several factual determinations which are supported by the record and are not clearly wrong. In addition, the physical characteristics and history of Bayou Road are not in serious dispute. We recite those facts as a prelude to our disposition.
*915 Bayou Road is a rural highway with two travel lanes each ten feet in width.[2] There is no curb or shoulder as that term is defined in La. R.S. 48:1.[3] The testimony of the expert Joseph Blaschke defines the area adjacent to Bayou Road as being approximately 2 to 2 ½ feet wide and is, in actuality, a part of the road bed that is not asphalt. Right past this "shoulder" area the roadside becomes a rather steep embankment sloping toward Bayou Terre aux Boeufs.[4] The trial judge concluded that the utility pole which Rivera struck was three feet from the road's edge. The court also estimated that, based on Rivera's speed of 40 mph and Bertucci's estimated distance of 50 to 200 feet, Rivera was off the road for only one to three seconds before he hit the pole. Although not mentioned in the court's reasons, our own examination of the record, particularly the photos, satisfies us that it is more probable than not that the wheels on the driver's side of the car never left the road. Considering that the vehicle's wheels are six feet apart, that the testimony showed that Rivera did not try to turn back on the highway and that the pole is three to four feet from the road's edge, it is reasonable to conclude that the left wheels of Rivera's vehicle never left the surface of the roadway prior to the collision.
The evidence also substantiates the history of Bayou Road as noted by the trial judge. Before becoming part of the state highway system, Bayou Road was a parish road. No one seems to know when it was first built or hard surfaced. In all probability it initially started as a foot path along Bayou Terre aux Boeufs and then was shelled, and finally hard surfaced. In any event, it came into the State Highway system by virtue of Act 95 of 1921[5]. Although there is no evidence to suggest when, or who, initially erected the utility poles along Bayou Road, in June of 1925, and March of 1926, the St. Bernard Police Jury granted utility franchises in that area to St. Bernard Ice Co. and John Reid, respectively. Eventually, in September of 1927, those franchises were transferred to Louisiana Power and Light Company, Entergy's predecessor.[6]
Based on the above facts, coupled with the testimony of various experts, Duaine T. Evans in particular, the trial court then made the legal conclusion that "Bayou Road is unreasonably dangerous for the travelling public ... particularly because the poles are too close and there is no curb." The court further concluded that DOTD had an implied right of way for Bayou Road which extended to the area where the pole was located, and thus it was responsible for the danger caused by the close proximity of the pole to the highway. For that reason the greater fault was apportioned to DOTD.
The court also reasoned that LP & L "cannot blindly and idly sit by and ignore the dangerous situation that exists on Bayou Road." Relying on the testimony of plaintiff's expert, Duaine Evans, the court opined that reflectors should have been on the poles which could alert a driver at night of their close proximity. The court rejected LP & L's attempt to place the entire fault on DOTD concluding that LP & L did not obtain permission from DOTD to locate the poles, and thus the reasoning of Smith v. City of New Orleans, 616 So.2d 1262, (La. App. 4th Cir.1993), writ den. 624 So.2d 1232, 1233 and 1234 (La.1993) was inapplicable. Because LP & L owned the poles and did nothing with respect to their location, a portion of the fault was allocated to it.
*916 DOTD and LP & L argue in the first instance that the location of the utility pole did not pose an unreasonable risk of harm, and therefore our inquiry should go no further. They also argue that the entire fault for the accident should rest with the driver, Rivera. Each then presents various arguments as to why the trial court's imposition of fault is erroneous. We now address those arguments.

DOTD
Plaintiffs argue that DOTD's fault is premised on the lack of edge striping, a curb and/or shoulder area along the road. The trial court's reasons indicate that DOTD's fault lies in the fact that the pole was in close proximity to the highway and was within an implied right of way in favor of DOTD. Absent any curbing to help prevent a car from leaving the road, the trial judge reasoned that DOTD contributed to an unreasonably dangerous situation.
For the following reasons we disagree with those conclusions and reverse the allocation of fault to DOTD.

A) Road Condition
Any analysis of DOTD's responsibility requires consideration of the classic duty risk requirements first set out in Dixie Drive It Yourself System v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962) and Hill v. Lundin & Associates, 260 La. 542, 256 So.2d 620 (1972). We specifically focus on the "cause" issue, both legal and factual. The "cause in fact" analysis is basically a "but for" inquiry. "If the victim probably would not have encountered the harm but for the defendant's conduct, the conduct can be considered a cause-in-fact." Armand v. Louisiana Power and Light Company, 482 So.2d 802, (La.App. 4th Cir.1986), writ den. 484 So.2d 669 (La.1986). See, also Bannerman v. Bishop, 28,382 (La.App. 2 Cir. 7/2/96), 688 So.2d 570, writ denied, 96-2755 (La.1/10/97) 685 So.2d 146. A counter-factual hypothesis is recommended as a step in determining cause-in-fact. Robertson, The Common Sense of Cause in Fact, 75 Tex. L.Rev. (1997). That is, assuming that the conduct of the tortfeasor was "corrected", is it probable that the plaintiff would still have sustained the damages complained of. If so, then defendant's substandard conduct was not a cause-in-fact. We find that analysis particularly appropriate with respect to the liability imposed on DOTD vis-a-vis the condition of the road.
Although we can easily agree with the trial court's observation that Bayou Road is not a safe highway, we find that its condition was not a cause-in-fact of the accident which killed Reed. Plaintiff's expert, Duaine Evans, initially testified that the lack of a shoulder and the slope of the adjacent land played a part in causing the accident. He opined that edge striping would have alerted a driver and perhaps prevented him from drifting off the road. However, when confronted with his deposition testimony, he acknowledged that he really could not say whether shoulder maintenance or lack of maintenance played a part in this accident. After review of the evidence, we find that plaintiff failed to prove that the condition of the road was a cause-in-fact of the accident. Thus, even assuming DOTD had a duty to either stripe the edge or build a curb, absence of either was not a cause of this accident. Rivera's leaving the roadway was not caused by any defective condition of the road. See, Begnaud v. Department of Transportation and Development, 93-639 (La.App. 5 Cir. 1/12/94), 631 So.2d 467, writ den. 94-0367 (La.3/25/94), 635 So.2d 230. And, given the minuscule period of time before striking the utility pole, the presence of a shoulder would have made no difference. The same analysis, however, is inapplicable to the utility pole.

B) DOTD and the Utility Pole:
Application of the same cause in fact test to the location of the utility pole satisfies us that it was a substantial cause-in-fact of the accident. That is, had the pole not been located three feet from the edge of the road, it is probable that the collision would not have occurred and Reed would not have been killed. Our inquiry, therefore, is whether, with respect to DOTD, the location of the pole was a legal cause of the accident. The answer to that inquiry requires a determination of whether the pole posed an unreasonable risk of harm and, if so, whether DOTD *917 had a duty to protect against that risk. The trial court imposed a duty on DOTD, vis a vis the pole, by making the factual determination that it was located within DOTD's implied right of way. That factual determination was predicated on the testimony of Robert Roth, DOTD's engineer, and on the provisions of La. R.S. 48:220.1. For the following reasons we conclude that the trial judge erred in that determination.[7]
Revised Statute 48:220.1 was enacted in 1976 and provides:
Whenever the Department of Highways, under its statutory authority takes over an existing road from a parish or municipality, unless there is an agreement between the two agencies to the contrary, the department shall acquire all of the rights which the ceding agency possessed with regard to the ceded road or street. In those instances where the highway was constructed by the parish or municipality without a recorded conveyance or dedication of the right of way by the landowner, and in those instances where the department has constructed a highway without a recorded conveyance or dedication by the landowner, the width of the right of way servitude for the said highway shall include the roadway, shoulder, roadside ditch and an area extending one and one-half feet beyond the rear or outside slope of the roadside ditch. Nothing herein shall affect title to any buildings or fences, nor require their removal without payment of just compensation therefor, nor shall anything herein affect title to the soil beneath the highway right of way nor to any minerals thereunder. The existence of the highway for a period in excess of three years shall vest title to the right of way servitude in the Department of Highways.
We find the trial judge's reliance on the above statute misplaced.
It is undisputed that Bayou Road came into the state system in 1921 long before the enactment of R.S. 48:220.1. In 1921, according to the evidence in this record, the only right of way owned by St. Bernard Parish was that which it acquired by use, i.e. the actual width of the road. And, in 1921 the state could not acquire any more that what the parish owned. See, Village of Moreauville v. Boyer, 138 La. 1070, 71 So. 187 (1916). Since R.S. 48:220.1 permits a taking of private property, it cannot be applied retroactively. State, Dept. Of Highways v. Traina, 347 So.2d 55 (La.App. 2d Cir.1977). Thus, that statute is inapplicable in the instant situation and does not create any right of way in favor of DOTD in excess of what was acquired by it when Bayou Road came into the state system in 1921.
The trial judge also opined that since DOTD had cut the grass along the road for many years, it had acquired a right of way and thus was responsible for the pole's location. The court relied on the testimony of Robert Roth, DOTD's maintenance engineer, in reaching that conclusion. While we do not disagree with the conclusion that perhaps DOTD acquired a servitude for the purpose of keeping the grass cut, that servitude of use cannot be the basis to impose liability for the location of the utility pole.[8] To so hold would be a "quantum leap" of judicial activism. Simply put, the record is barren of any evidence suggesting that DOTD had anything to do with the placement of the utility poles. It did not give LP & L or anyone else permission to place the poles along Bayou Road. DOTD did not own the land adjacent to the highway nor did it have any adjacent servitudes. Given the unusual history of Bayou Road and the circumstances of this case, we find no basis in law or fact to impose liability on DOTD for the location of the utility pole.
Plaintiffs argue, however, that even if the pole is not on DOTD's right of way, it still has responsibility for hazards originating on private property. In support, they cite numerous cases which we find unpersuasive *918 because each involves a hazard that, was, in fact, located on the highway, on its shoulder/right of way or protruded over same.[9] The most relevant of the cited cases is Wilson v. State, Through Dept. of Highways, 364 So.2d 1313 (La.App. 3rd Cir.1978), writ denied, 366 So.2d 563 (La.1979). In that case, DOTD was found liable for the injuries plaintiff sustained when the vehicle in which she was riding hit a tree which had fallen across the highway. Several days prior to the accident there was a considerable amount of bad weather which had caused the tree to lean towards the road. DOTD knew of this condition but failed to cut it down. The court concluded that where "imminent danger" is posed by a hazard located on private property, DOTD cannot simply ignore it.
Obviously, a tree about to fall across a highway is an "imminent danger" and the Wilson court correctly held DOTD responsible for not taking preventive action where it knew of the danger. However, the holding of that case must be limited to its facts. In the instant case, the utility pole does not pose the same "imminent danger" that the tree in Wilson posed. There, DOTD knew of the precarious, leaning tree before it fell across the highway. Here, as we discuss infra, although the pole is dangerous, that danger is predicated on the actions of an inattentive driver, which cannot be considered a danger that is imminent. For that reason, we find Wilson distinguishable and not supportive of plaintiffs' attempt to hold DOTD responsible for the pole's location outside of any right of way. See, Adams v. State Dept. of Highways, 357 So.2d 1239 (La.App. 2nd Cir.1978), where the court recognized that the state had no authority to remove a tree not located on its tacit right of way and not posing an immediate danger to users of the right of way. We hold that the trial judge manifestly erred in allocating fault to DOTD.[10]

FAULT OF LP & L:
First, LP & L argues that the location of the utility pole did not pose an unreasonable risk of harm and therefore it cannot be responsible either in negligence or strict liability (C.C. art. 2317). Second, it argues that our holding in Smith v. City of New Orleans, 616 So.2d 1262 (La.App. 4th Cir.1993), writ denied, 624 So.2d 1232, 1233 and 1234 (La. 1993), shifts any responsibility for the pole's location to DOTD. Finally, it argues that Rivera's inattentiveness and failure to drive prudently, and not the utility pole's location, was the cause of Reed's death. For the following reasons, we disagree with those arguments.
LP & L is the owner/custodian of the utility pole in question. Thus, in addition to a negligence theory, responsibility can also be predicated on Civil Code Article 2317. Either theory, however, hinges on whether the pole posed an unreasonable risk of harm.[11] The trial judge concluded that the close proximity of the pole to the edge of the road surface made it unreasonably dangerous *919 and unsafe. The court reasoned that the placement of reflectors would have been relatively cheap and would "alert a driver at night of the close proximity of the poles along the road."
The location of a utility pole less than a car's width from the edge of Bayou Road unquestionably poses a hazard to the users of that road. However, the finding of a defect or hazard is "not a sufficient analysis to establish liability." Boyle v. Board of Supervisors, Louisiana State University, 96-1158 (La.1/14/97), 685 So.2d 1080. The court must then determine the unreasonableness of the hazard. That determination is made by utilization of the risk utility balancing test wherein factors such as gravity and risk of harm, individual and societal rights, social utility and cost of repairs are weighed. Id. See also, DeLaughter v. West Jefferson Levee District, 94-0064 (La.App. 4th Cir. 11/30/94), 646 So.2d 506, writ denied 94-3170 (La.2/9/95), 649 So.2d 428.
Death is the ultimate harm and thus the gravity of the injury in this case is not questioned. Although the trial judge excluded evidence of other accidents on Bayou Road involving utility poles, we reach the conclusion that the risk posed by the pole's location is substantial. Our conclusion is based on the close proximity of the pole to the traveled portion of the highway and particularly the fact that it would be impossible for a vehicle to completely leave the highway, even on purpose, at that point without hitting the pole.
The social utility of the pole also cannot be questioned. According to Mark Bruckner, distribution supervisor for LP & L, that line provides electricity to 5,000 customers. The cost of moving the entire line was estimated by Bruckner at $10,000,000.00. Relocation underground is not a reasonable alternative because of the necessity for a second power source when underground lines go out. The alternative of moving the poles to the other side of the highway is also not feasible according to Bruckner.
Duaine Evans, plaintiff's expert, opined that reflectors on the poles would make drivers, especially those like Rivera who were unfamiliar with the road, more aware of their presence. This would be especially true for night drivers, as the trial judge noted in his reasons. Furthermore, reflectors are relatively cheap and easy to install.
Opposing Evans' opinion was that of Joseph Blaschke, an expert in traffic engineering, who testified that reflectors or markers would have made no difference in this case. He based his opinion on the lack of perception reaction time, and the fact that there was already a white sign on the pole advertising mirlitons which provided greater visibility than a reflector would have. He opined that driver error was the sole cause of the accident and that the utility pole was not a factor. Ned Walton, an expert in civil and traffic engineering, agreed that reflective devices would not necessarily make the poles themselves readily obvious to the observant driver. He did testify, however, that object markers on a series of poles would give an incremental, additional piece of information that something is being marked. He also opined that driver error was the cause of the accident.
Weighing these various factors, we agree with the conclusion that the risk of harm posed by the unmarked utility pole is substantially greater than if the series of poles had reflector devices or were marked in some way. We find that the utility pole, because of its location, posed an unreasonable risk of harm which substantially contributed to Robin Reed's death. We further find that LP & L bears responsibility for the unreasonable risk posed by the pole on both negligence and article 2317 theories of liability.
As we previously noted, LP & L owns and has custody of the pole and is responsible for its location. The pole, because of that location, is a defective thing (unreasonably dangerous) for which the owner/custodian is liable. Furthermore, we agree with the trial judge that LP & L had at least constructive knowledge, if not actual, that a pole located less than a car's width from the traveled portion of a highway poses a risk of harm which it had duty to protect against. Stated another way, the reasonable man (LP & L) should have been aware that the occasional *920 inadvertence of a driver on Bayou Road would result in his/her vehicle momentarily leaving the road and that the extreme close proximity of its utility pole posed a substantial risk to that driver. For that reason, liability based on negligence is not error.
LP & L argues that our holding in Smith v. City of New Orleans, 616 So.2d 1262 (La. App. 4th Cir.1993), writ den. 624 So.2d 1232, 1233 and 1234, (La.1993), shifts any responsibility for the location of the utility pole to DOTD. In Smith we held that NOPSI bore no responsibility for the placement of a utility pole eighteen inches from the street's curb. The pole was within the state's right of way. We reasoned that because the state had the authority to require the pole's removal, it had the duty to make sure its placement was safe. Because NOPSI has no traffic engineers or expertise and relies on the city and state as to traffic hazards and, because the state did not object to the placement of the pole, the state, not NOPSI, bore the responsibility for its location. Those factors are not present in this case, and thus Smith's reasoning is inapplicable. We have already determined that the pole is not located within the state's right of way, that there was no permission granted by DOTD or its predecessors to locate the utility poles, and that there is no evidence to suggest DOTD could order the pole's removal. As we previously determined, La. R.S. 48:220.1, adopted in 1976, does not convey to DOTD the authority to order the removal of utility poles which were in place long before the statute was enacted. Thus, the holding in Smith simply does not apply in this case.
Finally, LP & L argues that the sole cause of this accident was error on the part of the driver, Rivera. The trial judge agreed with this argument to the extent of 15% of the fault. LP & L argues it should be 100%. This argument raises the issue of reallocation of fault, and requires consideration of the factors set forth in Watson v. State Farm Fire and Casualty Ins. Co., 469 So.2d 967 (La.1985).
Watson provided the following guidelines for allocation of fault by an appellate court where the trial court's findings are manifestly erroneous in that regard. We are instructed to consider: "(1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought." Id. at 974.
Applying these factors, and after consideration of the entirety of the evidence, we conclude that the majority of fault is that of the driver. His inadvertence caused the vehicle to leave the highway. There was no credible evidence to suggest anything other than carelessness was the reason for Rivera's actions.[12] However, because of the close proximity of the utility pole, Rivera's inattention turned into a tragedy. For that reason, LP & L must also bear responsibility. Accordingly, we reapportion the fault previously assigned to DOTD to the driver, Rivera. Fault is allocated 60% to Rivera, 25% to LP & L and 15% to Reed.[13]
REVERSED IN PART; AMENDED AND AFFIRMED IN PART.
MURRAY, J., dissents in part.
MURRAY, Judge, dissenting in part.
While I agree with the majority's analysis and conclusions with regard to the findings of liability as to Department of Transportation and Development of the State of Louisiana (DOTD) and Louisiana Power and Light, Inc. (LP & L), I respectfully dissent with regard to its reallocation of fault. I cannot agree that the driver must bear the majority *921 of fault for the death of Ms. Reed. There is no question that he set the wheels in motion for this tragedy to occur by driving partially off the road, for whatever reason. However, this inadvertent act at night by someone who was not speeding and who was not familiar with this undisputedly "unsafe" highway cannot be the primary cause of that tragedy. As the majority points out, the left side of Mr. Rivera's car had not even left the roadway when it collided with the utility pole.
For this reason I would allocate to LP & L the fault attributed to DOTD by the trial court so that the fault would be allocated 70% to LP & L, 15% to Mr. Rivera and 15% to Ms. Reed.
NOTES
[1] Fault is the only issue argued on appeal.
[2] Originally Bayou Road was State Hwy. 46. However, in 1984 a new Highway 46 was built to the north of Bayou Road.
[3] La. R.S. 48:1 defines shoulder as "the portion of the highway contiguous with the roadway for accommodation for stopped vehicles, for emergency use and for lateral support of base and surface."
[4] Bayou Road parallels what has been described by some witnesses as a "ditch." Actually, that waterway, at some time in the past, was the upper reaches of Bayou Terre aux Boeufs. In any event, it is undisputed that the land on the south side of the road slopes towards the waterway.
[5] In that act, the road was designated as Route 32. It began at Poydras and extended to Shell Beach.
[6] Mark Bruckner, LP & L's supervisor of distribution area design, testified that his best determination is that the line was constructed sometime between 1925 and 1928.
[7] For purposes of the instant discussion we will assume that the location of the pole poses an unreasonable risk of harm. We discuss, infra, LP & L's argument on this issue.
[8] Roth testified that both DOTD and St. Bernard Parish cut the grass along Bayou Road during the mid 1980's. Perhaps, St. Bernard also acquired a servitude. Regardless, that would not impose liability for the location of the utility pole.
[9] Green v. State, Through Department of Transportation and Development, 93-1352 (La.App. 3rd Cir. 5/4/94), 637 So.2d 170, writ den. 94-1973 (La.11/4/94), 644 So.2d 1061 summary judgment issue involving ownership of right of way where hazardous traffic light located; Garrick v. Washington Parish, 440 So.2d 787 (La.App. 1st Cir. 1983), writ den. 444 So.2d 1222 (La.1984), DOTD liable for a concrete apron which extended unto shoulder of the highway; Lang v. Prince, 447 So.2d 1112 (La.App. 1st Cir.1984), writ denied 450 So.2d 1309 and 450 So.2d 1311, (La. 1984), the utility pole was in the right of way; Begnaud v. Department of Transportation and Development, 93-639 (La.App. 5th Cir. 1/12/94), 631 So.2d 467, writ den. 94-0367 (La.3/25/94), 635 So.2d 230, DOTD failed to follow recommendations of its maintenance superintendent to remove adjacent trees and build a shoulder at the time road was resurfaced; plans showed a shoulder which was not built; Gibson v. State Through Dept. of Transportation, 95-1418, 95-1419 (La. App. 1st Cir. 4/4/96), 674 So.2d 996, writ den. 96-1862, 96-1895, 96-1902 (La.10/25/96), 681 So.2d 373 and 374, DOTD responsible because the concrete bridge cap which plaintiff collided with was within DOTD's right of way.
[10] We reapportion that fault, infra. and, because we find that the condition of the road was not a cause in fact of the accident, it is not necessary to discuss the various opinions as to how Bayou Road could be improved.
[11] Article 2317 refers to a defective thing. Defect has been jurisprudentially defined as posing an unreasonable risk of harm. Under a negligence theory, a duty is imposed to protect against an unreasonable risk of harm. Thus, in both instances the unreasonableness of the harm or risk must be determined.
[12] Arguments are made by both DOTD and LP & L that Reed's advances may have caused Rivera's inattentiveness. The trial judge did not believe Rivera's testimony in this regard. We can not say that credibility call is erroneous. Regardless, irrespective of the reason, Rivera was careless and inattentive. He drove off the road.
[13] Plaintiffs did not appeal nor answer the appeal, thus the allocation of fault to Reed cannot be reduced by us.