745 So.2d 91 (1999)
Avis Courteaux, Wife of/and Robert A. COURTEAUX, Sr., Individually, and as Legal Tutors of Their Minor Child, Christopher A. Courteaux
v.
STATE of Louisiana, through the DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT and the St. Bernard Parish Government.
Joseph Martin Pelas, Sandy Ann Pelas, Angel Ann Pelas, Wife Of Carl Holcombe, Rachael Ann Pelas, Wife Of Peter Fontana, Jr. and Darlene Gonzales, Wife of Earl Johnston, On behalf of the Estate of Barbara Ann Pelas
v.
Christopher A. Courteaux, Progressive Insurance Company, ABC Insurance Company, Louisiana Power and Light Company, Def Insurance Company, Parish of St. Bernard, Ghi Insurance Company And Department of Transportation and Development, State of Louisiana
Nos. 99-CA-0352, 99-CA-0353.
Court of Appeal of Louisiana, Fourth Circuit.
September 22, 1999.
Writ Denied January 28, 2000.
*93 Sidney D. Torres, III, Roberta L. Burns, Gregory J. Noto, Law Offices of Sidney D. Torres, Chalmette, LA, Counsel For Plaintiffs Avis Courteaux, wife of/and Robert A. Courteaux, Sr., individually and as legal tutors of their minor child, Christopher A. Courteaux.
Gregory S. Duhy, Chalmette, LA, Counsel For Plaintiffs Joseph Martin Pelas, Sandy Ann Pelas, Angel Ann Pelas, wife of Carl Holcombe, Rachael Ann Pelas, wife of Peter Fontana, Jr. and Darlene Gonzales, wife of Earl Johnston, on behalf of the estate of Barbara Ann Pelas.
Richard P. Ieyoub, Attorney General, Jay C. Zainey, Special Assistant Attorney General, Metairie, LA, Counsel For Defendant, State Of Louisiana Department Of Transportation And Development.
Court composed of Judge STEVEN R. PLOTKIN, Judge CHARLES R. JONES and Judge MIRIAM G. WALTZER.
WALTZER, Judge.

STATEMENT OF THE CASE
This suit arises out of a head-on collision between an automobile driven by *94 Christopher Courteaux and one driven by Barbara Ann Pelas. The collision was fatal to both drivers. Courteaux's parents sued the State of Louisiana, through the Department of Transportation and Development and the St. Bernard Parish government. The Pelas family sued those defendants and Courteaux, his insurer, Louisiana Power and Light Company (now Entergy, Inc.) and two unnamed insurers. The cases were consolidated for trial on the merits.
The State filed a third party demand and cross claim against Courteaux's estate, his insurer and the underinsured motorist insurer of the car Pelas was driving. Courteaux's insurer deposited its policy limits together with legal interest into the registry of the court. The State voluntarily dismissed its claim against the underinsured motorist carrier.
Entergy filed a third party demand and cross-claim against Courteaux's estate and his insurer. The Pelas plaintiffs received the funds deposited by Courteaux's insurer and dismissed their claims against the Courteaux estate and the insurer; they also settled and dismissed their suit against Entergy.
The remaining Courteaux and Pelas claims against the State and the Parish were tried to the court. Following trial, the court entered judgment in favor of the Pelas plaintiffs and against the State in the total amount of $1,329,897.60 and apportioning fault 80% to the State, 10% to Entergy and 10% to Courteaux. The court entered judgment in favor of the Courteaux plaintiffs and against the State in the amount of $541,359.45, after having deducted 10% attributable to Courteaux's fault. From these judgments, the State appeals. Because we find the attribution of fault to be manifestly erroneous and an abuse of the trial court's great, even vast discretion, we amend the Courteaux judgment to allocate 25% fault to Courteaux. We amend the Pelas judgment to allocate 10% fault to Entergy, 22.5% to Courteaux and 67.5% to the State. We affirm the judgments in all other respects.

FINDINGS BY THE TRIAL COURT
The trial court entered reasons for judgment. The court found that on 23 October 1994, Ms. Pelas was driving east on Bayou Road. Traveling in the same direction were cars driven by Leslie Delacroix, in front of Ms. Pelas, and by Jennifer Bertaut, behind Ms. Pelas. Courteaux was driving west-bound, negotiated a curve, passed closely to the Delacroix car, left the west bound lane and struck the Pelas car. Debris from the Pelas car struck Ms. Bertaut's car. After the impact, both vehicles spun. Courteaux rested on the grassy shoulder area partially off the pavement of the west bound land; Pelas struck a telephone pole protruding from the bayou and rested against the pole over the narrow shoulder and partially on the pavement. Ms. Pelas and Mr. Courteaux were taken to the hospital by emergency units, where they died.
Ms. Delacroix witnessed the accident in her rear view mirror, and Ms. Bertaut witnessed the accident from her vantage point behind the Pelas car. Constable Leroy Couture arrived on the scene shortly after the accident.
Ms. Delacroix testified that Courteaux came close to her as he passed, close enough to concern her that he might hit the rear of her car. Ms. Bertaut noticed this near collision and testified that after having come close to the Delacroix car, Courteaux went back into his lane and then into the lane of oncoming traffic, striking the Pelas car. Ms. Bertaut did not see Courteaux's car leave the roadway. She testified that the accident happened very quickly, that Courteaux moved suddenly and crossed the center line, leaving Ms. Pelas no time to react.
Deputy Sheriff Louis Gomez, the investigating officer, determined that the exact point of impact was on the south side of the east bound lane two and one-half miles west of the junction of Louisiana Highway 300 and Louisiana Highway 46. He noticed *95 but did not measure a drop-off between the roadway and shoulder. He inspected the exterior of Courteaux's tires, found no skid marks, and estimated the speed of both vehicles to have been approximately 55 miles per hour.
Constable Couture testified that he offered his assistance to Deputy Gomez, and checked for ruts in the pavement because he had noticed that many cars go into the bayou after having left the pavement. He walked approximately 50 to 75 feet from the scene and found a drop off of about six inches. He noticed a black rubber-like substance eight to ten feet along the drop off which appeared to him to have been the scraping of a tire. From that point, he noticed a 25 foot long tire mark that appeared to show a vehicle had reentered the roadway. He could not confirm that this mark came from Courteaux's car, but believed it was a new mark that he had not noticed prior to the accident, although he drove Bayou Road several times a day. The evidence is in conflict as to whether Couture gave this information to Deputy Gomez.
The court reviewed the expert testimony offered by the parties.
The court discussed the testimony of the State's experts and their theories that Courteaux never left the roadway, and that the accident was caused solely by Courteaux's driver error when he came out of a curve and drifted into Ms. Pelas's travel lane. The State's witnesses included two DOTD engineers, one retired DOTD engineer and a road design expert currently employed by the DOTD.
Engineers Steven Strength and Robert Roth testified to Bayou Road's history, present condition and condition at the time of the accident. According to Roth, an expert in highway construction and design, in 1983 the State attempted to abandon the road, and discontinued maintenance and removed all state identification markers until 1993. In 1994, prior to the accident, the state reinstituted maintenance which included re-striping and repairs. Roth acknowledged that although a two inch drop-off of the pavement is significant, the State repairs defects only in excess of three inches. Further, he admitted that Bayou Road has not been brought to American Association of State Highway and Transportation Officials (AASHTO) standards.
Strength, a safety engineering expert, opined that the posted 55 miles per hour speed limit was safe and acceptable for this portion of Bayou Road. In his opinion, a lower speed limit would create excessive passing with some drivers ignoring the limit and others obeying it. He testified that the area was properly striped and that edge lines are not normally used for lane widths under 22 feet. He acknowledged under cross-examination that the Parish had requesting striping and edge lines, citing numerous accidents and deaths on this section of highway. According to Strength, the State did not exercise its discretion to apply edge lines.
Richard Savoie, an expert in road design, testified that he inspected the site in September 1997 and found no defects. According to Savoie, AASHTO standards apply only to new or reconstructed roads, and Bayou Road, which entered the state road system in 1912 as a gravel road, was blacktopped in the mid-1960's and overlaid with asphalt in 1981, had never been "reconstructed". The road is classified by its traffic as a rural collector road, which category mandates ten foot lanes. Savoie testified that he was familiar with La. R.S. 48:192 which requires that all inadequate roads be brought up to code. Under cross-examination, he opined that the cost of such reworking would be one million dollars per mile, and that the statute refers to discretionary decisions involving prioritization of public projects and budget constraints. The State did not present evidence concerning why reconstruction of Bayou Road had not been requested or budgeted.
*96 Francis H. Wyble, an expert in traffic engineering, highway maintenance, geometric design and accident reconstruction, distinguished between a "reconstruction" and the asphalt overlay undergone by the road in 1981, which he characterized as resurfacing. Under cross-examination, he was shown the plan for the 1981 overlay, which provided for a three foot shoulder on the bayou side of the road. He opined that the plans should have been followed, and that the slope of the shoulder into the bayou presently exceeds the slope set forth in the overlay plan.
Wyble concluded that the accident was caused by Courteaux's error in drifting into Ms. Pelas's path. He described Bayou Road as very unforgiving, and testified that a driver would soon be in trouble if he deviated from the road surface in any way. He opined that adding signage and lowering the speed limit would not solve the problem. He disputed Burkhardt's and Griffin's steering overcompensation conclusion, with a 20 degree angle of re-entry onto the highway and a 10 degree impact point between the vehicles. According to Wyble, had Courteaux continued at a 20 degree angle after reentering the highway, he would have crossed the east bound lane and entered the bayou. He agreed that Ms. Pelas had only three-quarters of a second to react and had no chance to avoid the accident.
Raymond Burkhardt, plaintiffs' accident reconstruction and signage expert, testified that Courteaux maneuvered to avoid the Delacroix car and went off the pavement. He was then caught in a drop-off between the highway's edge and the shoulder. As a result, he overcompensated to release his wheels and reentered the highway at a 20 to 30 degree angle. He attempted unsuccessfully to turn back into his lane and struck the Pelas car at a 10 degree angle of impact. Burkhardt testified that among additional causative factors were an excessive posted speed, lack of road edge markers, difference in lane widths and "hot patches" of asphalt that gave the appearance that the lanes were wider than they actually were.
Burkhardt testified that his inspection revealed numerous drop offs along the pavement of the east bound lane of Bayou Road from one-half inch to two and one-half inches. One hundred seventy-five feet from impact, the drop was two and one quarter inches; at 95 feet the drop off was one and one quarter inches. He testified that there was inadequate shoulder of less than two feet along the highway to allow a recovery and return to the pavement. The state standard for a rural collector road such as Bayou Road, handling 1000 cars a day, is an eight foot shoulder. The shoulder in question did not even meet the standards set forth in DOTD's own 1981 asphalt overlay plan.
Oscar F. Griffin, plaintiffs' accident reconstruction expert, testified from photographs of the accident site. The court found he was very familiar with the immediate area of the collision because of prior analysis in other accidents. He noted drop offs ranging from three inches at 61 feet from impact to two and one-quarter inches at 175 feet from impact. He found no usable shoulder, and said that the ten degree angle of impact would result from the vehicle's having left the road and having overcompensated upon return. According to Griffin's analysis, Courteaux's last maneuver prior to impact was a swerve or lane change typical of a maneuver occurring after leaving the road surface. Griffin opined that an adequate shoulder of at least eight feet could have allowed Courteaux to regain his position on the pavement without a substantial veer or steering maneuver to climb over the drop off.
The court, having reviewed the expert testimony, concluded that the facts did not support the defense experts' theories and that the accident was the result of Courteaux's leaving the roadway to the extent that his passenger side wheels become caught in a drop off of the pavement. As a result, he reacted by steering hard to his left, over compensating, and forcing him *97 on an angle into the Pelas car. Because Courteaux initially steered off to the right of the roadway, having passed too close to the Delacroix vehicle and steering too far to the right, his fault contributed 10% to the accident. The court noted that had there been no drop off and an adequate shoulder, Courteaux would have had a recovery zone and would not have over-steered into Ms. Pelas's path.
The court specifically rejected the testimony of the defense experts that this stretch of Bayou Road is safe, and concluded that the overall dangerous conditions existing on Bayou Road were the main cause of the accident. The court noted that none of the State's experts disputed the fact that the State had actually removed signage and stopped maintenance of the road from 1983 until shortly before the accident in 1994, when it resumed posting the highway as LA Ext. 300. The State was aware of numerous accidents and deaths that occurred on the road, and Parish entities had requested posting of signage indicating the dangerous nature of Bayou Road.
As to Ms. Pelas's death, the court found the location of Entergy's pole to have contributed 10% to her damages, thereby reducing the State's liability to 80%. The pole was irrelevant to Courteaux's damages.
These conclusions, the court felt, were consistent with the testimony of Ms. Delacroix and Ms. Bertaut, as to Courteaux's sudden moves and near collision with Ms. Delacroix. The court specifically noted that it was "most impressed by the testimony of the independent witnesses [Constable Couture, Ms. Bertaut and Ms. Delacroix]."
As to damages, the court found that Courteaux was the seventeen year old only mutual child of Robert and Avis Courteaux, and that he was alive and either semi-conscious or unconscious at the accident scene. Since witnesses heard him moan, the court concluded he was alive and died at the hospital, and awarded $30,000 for his survival action. The court noted the uncontroverted evidence of a close, loving family, and awarded $275,000 for each parent's wrongful death claim. In addition, the court awarded funeral costs of $10,587.37 and medical expenses of $10,908.13. Damages were reduced by Courteaux's apportioned fault of 10 percent.
The court found that the evidence established that Ms. Pelas was alive and conscious at the scene, and Constable Couture heard her exclaim, "Lord, have mercy on my children." The court concluded she was in great pain, suffered until her death and was aware of the seriousness of her injuries. The court awarded $150,000 on the survival action, $680 for ambulance costs and $4,217.69 for funeral expenses. Ms. Pelas was a 47 year old single mother of five adult children. The court found the family was close. Her daughter, Sandy, lived with Ms. Pelas; she and two other children, Joseph and Angel had special needs, were in special education and were unable to finish school. Because of insufficient income, Joseph and Angel did not live with their mother, but visited her every day. Joseph, who is mentally disabled, walked up to fifteen miles each day to visit his mother. None of the Pelas children knew their father. Pelas's daughter Barbara Hokum had completed her education and lived separately with her own family, but had a close relationship with her mother. Based on these findings, the court awarded wrongful death damages of $250,000 to Sandy, Joseph and Angel; $225,000 to Rachel, and $200,000 to Barbara.

STANDARD OF REVIEW
In reviewing the factual findings of a trial court, an appellate court is limited to a determination of manifest error. Hill v. Morehouse Parish Police Jury, 95-1100 (La.1/16/96), p. 4, 666 So.2d 612, 614; Ferrell v. Fireman's Fund Ins. Co., 94-1252 (La.2/20/95), 650 So.2d 742, 745; Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993); Arceneaux v. Domingue, 365 So.2d 1330 (La. *98 1978). It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.
Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985). Appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo. When findings are based on determinations regarding the credibility of witnesses, the manifest error clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict a witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. However, where, as here, such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong." Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989).
Our review of the record in its entirety convinces us that the trial court's findings are reasonable in light of that record.
We are instructed that before a factfinder's verdict may be reversed, we must find from the record that a reasonable factual basis does not exist for the verdict, and that the record establishes the verdict is manifestly wrong. Lewis v. State through Dept. of Transp. and Development, 94-2370 (La.4/21/95), 654 So.2d 311, 314; Stobart, supra. Although we accord deference to the factfinder, we are cognizant of our constitutional duty to review facts[1], not merely to decide if we, as a reviewing court, would have found the facts differently, but to determine whether the trial court's verdict was manifestly erroneous, clearly wrong based on the evidence, or clearly without evidentiary support. Ambrose v. New Orleans Police Department Ambulance Service, 93-3099 (La.7/5/94), 639 So.2d 216, 221; Ferrell v. Fireman's Fund Ins. Co., 94-1252 (La.2/20/95), 650 So.2d 742, 745.
When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts. Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973).
By analogy to the review of awards of damages for personal injuries, the trier of fact is owed great deference in allocating fault, for the finding of percentages *99 of fault pursuant to the comparative fault article, La.Civ.Code art. 2323, is also a factual determination. The Louisiana Supreme Court recognized the analogy between excessive or inadequate quantum determinations and excessive or inadequate fault percentage determinations. In both, the trier of fact, unlike the appellate court, has had the benefit of witnessing the entire trial and of reviewing first hand all the evidence. Clement v. Frey, 95-1119, 95-1163 (La.1/16/96), pp. 7-8, 666 So.2d 607, 610-611.
As to damages and, by analogy, apportionment of fault, the initial inquiry is whether the award for the particular injuries and their effects or apportionment of fault under the particular circumstances of the particular injured person is a clear abuse of the "much discretion" of the trier of fact. Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127 (1967); Ballard v. National Indem. Co. of Omaha, Neb., 246 La. 963, 169 So.2d 64 (1964); Gaspard v. Le-Maire, 245 La. 239, 158 So.2d 149 (1963). Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993) cert. den. 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994); Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Bitoun v. Landry, 302 So.2d 278 (La.1974); Spillers v. Montgomery Ward & Co. Inc., 294 So.2d 803 (La.1974).
The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to Justify modification of a generous or stingy award. Nevertheless, the theme that emerges from the jurisprudence is that the discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. It is only when the award or apportionment is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award or, by analogy, the apportionment. Youn v. Maritime Overseas Corp., supra.
This standard of review for damage awards requires a showing that the trier of fact abused the great discretion accorded in awarding damages and, by analogy, in apportioning fault. In effect, the award or apportionment must be so high or so low in proportion to the injury or fault that it "shocks the conscience." Moore v. Healthcare Elmwood, Inc., 582 So.2d 871 (La. App. 5 Cir.1991).

ASSIGNMENTS OF ERROR
The State argues that the trial court was manifestly erroneous in finding the following:
that Courteaux left the roadway and traveled onto the shoulder, before re-entering the roadway and striking the Pelas vehicle;
that any defects in the roadway caused the accident;
in giving more weight to plaintiffs' experts who relied on erroneous statements of fact rather than to defendants' experts who relied on correct statements of fact;
in referring to facts outside the record;
in finding Courteaux only 10% at fault;
and in awarding excessive damages to plaintiffs.
The trial court's lynchpin finding that Courteaux left the road and was caused to oversteer upon returning to the road because of a combination of insufficient shoulder and a drop off between the road and the shoulder is based on a fundamental credibility call. The State argues that its experts were more credible than those *100 presented by the plaintiffs and that the evidence does not support Constable Couture's conclusions. The State suggests that the trial court was manifestly erroneous in accepting the view that Courteaux went off the road and, because of a drop-off and insufficient shoulder, oversteered into Pelas when he returned to the road. According to the State, the trial court was clearly wrong in failing to accept the view of the current and former DOTD employees who testified that the accident was caused solely by Courteaux's having drifted into Pelas's path. The State suggests that the trial court was manifestly erroneous in choosing to give more weight to the testimony of Constable Couture rather to that of Deputy Gomez.
The State argues a lack of evidence that Courteaux left the road; however, Constable Couture testified to evidence of tire "scrubbing" in the area that Courteaux would have traveled immediately prior to impact. The fact that Deputy Gomez did not report these tire marks is not dispositive. At the time he made his examination, emergency vehicles were on the scene, and he had immediate responsibilities in securing the scene and assisting the emergency effort. Indeed, part of his investigation of the surface was made by peering underneath vehicles on the scene to examine the road surface. The trial court could have concluded that the constable's inspection, while made later in the evening, benefited from the constable's greater opportunity to access the entire accident scene, and to look for particular evidence, in this case the tire marks, that he believed might exist, based on his prior experience with accidents on this roadway. There is no evidence that Deputy Gomez actually examined the area to which the constable referred him.
This view is also supported by Ms. Delacroix and Ms. Bertaut, who described Courteaux's rapid movement into Ms. Pelas's path.
While a trier of fact would not have been clearly wrong in choosing to give greater weight to Deputy Gomez or to the current and former DOTD employee experts, none of the witnesses were so discredited by physical evidence or by a showing of bias or lack of expertise to justify a finding of manifest error in the instant case. The trial court properly exercised its discretion in determining the weight to be given to the testimonies of the various witnesses.
The wide latitude granted to a trial court in deciding to credit or disregard expert testimony is reflected in the Louisiana Supreme Court's decision in Mistich v. Volkswagen of Germany, Inc., 95-0939 (La.1/29/96), 666 So.2d 1073. There, the trial court's acceptance of plaintiff's "auto design expert" was approved by the Supreme Court. This expert had no engineering degree, had enrolled in engineering school for four quarters and was placed on academic probation for one quarter, changed schools and attended one quarter receiving two D's and an F, whereupon he was placed on academic probation. He transferred to a school of industrial design, was put on probation and took no engineering courses. He again transferred, this time to a College of Applied Arts and obtained a degree. He never obtained a license in engineering or any other field. He was laid off his first job after three months; he was fired from his second job after six months; he was fired from his third job after a few months. He then worked for two years in human factors engineering applied to military weapons systems and industrial systems, and was involuntarily dismissed. He worked for his subsequent employer for one year, leaving to become an independent consultant. None of his positions involved work in automobile design or engineering or in any way with automobiles. In his consulting career, he had no employees, facilities or equipment. In spite of this singularly undistinguished background, the trial court's decision to accept this individual as an expert in automobile design was accepted by our supreme court. Mistich v. Volkswagen of Germany, Inc., *101 supra at pp. 7-8, 666 So.2d at 1079. This precedent clearly provides a more than adequate basis for our finding that the trial court in the instant case was not manifestly erroneous in accepting the testimony of plaintiffs' experts.
At the time of this accident, the State, through DOTD, had a duty to maintain public highways such as Bayou Road, and the shoulders of such highways, in a condition that is reasonably safe for persons exercising ordinary care and reasonable prudence. This duty encompasses the foreseeable risk that for any number of reasons, including simple inadvertence, a motorist might find himself traveling on, or partially on, the shoulder. Whether DOTD breached its duty to the motoring public, by knowingly maintaining a defective or unreasonably dangerous shoulder, depends on the facts and circumstances of the case. Brown v. Louisiana Indem. Co., 97-1344, pp. 3-4 (La.3/4/98), 707 So.2d 1240, 1242.
The State argues that the plaintiffs failed to prove the elements of a claim against DOTD based on the alleged defective condition of the highway. Plaintiffs' burden was to demonstrate that:
1. The roadway was in the custody of DOTD;
2. the roadway was defective because of a condition that created an unreasonable risk of harm;
3. DOTD had actual or constructive notice of the risk; and
4. the defect was a cause in fact of the injuries. See Campbell v. Dept. of Transp. and Development, 94-1052 (La.1/17/95), 648 So.2d 898; Bessard v. State, Dept. of Transp. and Development, 94-0589 (La.11/30/94), 645 So.2d 1134.
The trial court in its reasons for judgment found several defects in Bayou Road. The State's argument asks us to consider each alleged defect separately; however, it is clear that it was the synergy of the various conditions on which the court relied in finding the roadway to have been dangerously defective.
There is no real dispute as to the existence of drop-offs, varying from less than two to five or six inches, from the roadway to the shoulder in the area of the tire "scrubbing." Wyble, a defense expert, described the roadway as unforgiving, in that any deviation from the traffic lane would cause the driver to quickly be in serious trouble.
While the State correctly points out that its expert testified that a speed limit of 55 miles per hour was safe for a roadway such as Bayou Road, the testimony of Constable Couture demonstrates that, given all the circumstances, the road could not be traveled safely at that speed by its daily burden of 998 vehicles.
Likewise, although DOTD's own engineering standards require road edge markers only for lanes 22 feet wide or wider, the trial court could determine from a totality of circumstances, including the speed limit and the condition of the edge of the highway and shoulder that in this particular situation lack of road edge markers contributed to a defective condition involving substantial risk of harm. The State argues that since the Manual on Uniform Traffic Devices provides that the value of such edge lines is as a visual reference for the guidance of drivers during adverse weather and visibility conditions, lack of the lines is irrelevant in the context of this accident, which occurred during the daytime on a clear, dry day. The trial court was not manifestly erroneous in concluding that even under favorable conditions the edge lines would provide a guide to the motorist seeking to remain away from the drop-offs and insufficient shoulder.
Similarly, the fact that the State's expert found nothing unusual or dangerous in the fact that the eastbound and west-bound lanes varied in width is not dispositive of the issue as to whether, under the particular circumstances of this case and considering the totality of conditions of the *102 roadway, the roadway was defective and created an unreasonable risk of harm. The State's own expert witness testified that the existence of a "hot patch" of asphalt overlay created a perception that the lane in that area was wider than it was. The trial court was not manifestly erroneous in combining this perceptual anomaly with the irregular lane widths, drop offs, insufficient shoulder and lack of edge lines to reach the conclusion that the roadway was defective and created an unreasonable risk of harm.
There is uncontroverted evidence of the State's actual notice of the highway's condition. The State's witness, Steven Strength, acknowledged that the Parish had notified DOTD of numerous accidents and deaths along this portion of Bayou Road, and had requested edge lines, additional signage and additional striping.
The State claims that these defects were not the cause in fact of the accident, relying on this Court's holding in Boteler v. Rivera, 96-1507 (La.App. 4 Cir. 9/17/97), 700 So.2d 913, writs denied, 97-3076 (La.2/13/98), 709 So.2d 756 and 97-3102 (La.2/13/98), 709 So.2d 757. That litigation arose from a single vehicle accident on Bayou Road. We agreed with the trial court's observation that Bayou Road is not a safe highway, but found that its unsafe condition was not a cause-in-fact of that fatal accident. Plaintiff's expert initially testified that the lack of a shoulder and the slope of the adjacent land played a part in causing the accident and opined that edge striping would have alerted a driver and perhaps prevented him from drifting off the road. However, when confronted with his deposition testimony, he acknowledged that he really could not say whether shoulder maintenance or lack of maintenance played a part in this accident. Our review of the evidence indicated that even assuming the State's duty to either stripe the edge or build a curb, Mr. Rivera's leaving the roadway was not caused by any defective condition of the road, and, since he immediately struck a utility pole, the presence of a shoulder would have made no difference.
Boteler is clearly distinguishable from the instant case. Here, there is credible testimony that the accident was caused by Courteaux's oversteering after his tires left the roadway, dropped off the asphalt and did not contact a substantial shoulder area. Plaintiff provided evidence through its expert, Oscar Griffin, that a standard eight foot wide, level shoulder could have eliminated the oversteering that brought Courteaux into Ms. Pelas's path.
The State argues that the trial court was clearly wrong in referring to facts outside the record, relying on the following excerpt from the Reasons for Judgment:
This Court rejects the testimony of the defendants [sic] that this stretch of Bayou Road is safe. The Court is regrettably too familiar with the tragic results that occur on this `safe' roadway. As previously indicated, this Court does not want to try any more death cases from Bayou Road.
The State contends that the trial court had a preconceived opinion about the State's liability, reflected in this portion of the Reasons for Judgment as well as in comments made and questions asked by the court during the course of the trial. We have reviewed the record as a whole and find no evidence of bias or preconceived opinion on the part of the trial court.
We have considered the State's claim that the damages awarded by the trial court are manifestly excessive, however, we find that the awards are not obviously the result of passion or prejudice, and they bear a reasonable relationship to the elements of the proved damages. A rational trier of fact could have decided that a lower award for one or more of the plaintiffs would be more appropriate; however, we cannot conclude from the entirety of the evidence viewed in the light most favorable to the prevailing parties in the trial court, that a rational trier of fact *103 could not have fixed the awards of general damages at the level set by the trial judge or that this is one of those "exceptional cases where such awards are so gross as to be contrary to right reason." Bartholomew v. CNG Producing Co., 832 F.2d 326 (5th Cir.1987); Youn v. Maritime Overseas Corp., supra, 623 So.2d at 1261.
Mr. and Mrs. Courteaux suffered the loss of the only child of their marriage, for whose wrongful death they each received $275,000. The trial court accepted the evidence of eyewitnesses to Courteaux's having moaned at the scene, indicating pain and suffering sufficient to support the $30,000 award for the survival action. The special damages are not contested.
The uncontroverted evidence showed that Ms. Pelas was a single mother. Three of her children, though adults, were in varying degrees dependent on her by virtue of their mental limitations; two daughters were capable of independent living, and were acknowledged to have had varying degrees of relationship with their mother. The awards, which ranged from $225,000 to $250,000 for the three most dependent children and for the independently living daughter who had the closer relationship to Ms. Pelas, to $200,000 for the daughter who did not maintain the same degree of closeness, took into consideration the disparity between the relationships and needs of the various children. These awards do not constitute an abuse of the trial court's great, even vast discretion.
By analogy, we have reviewed the evidence and must conclude that the apportionment of fault among the parties, specifically the attribution of only ten percent of the causative fault to Courteaux, exceeded the trial court's great, even vast discretion. This is one of the rare circumstances in which the apportionment of fault shocks the conscience and is manifestly, clearly wrong.
Courteaux was an inexperienced driver; however, he lived near Bayou Road for approximately seventeen years, and had been driving for approximately two years in the area. He had been working for six days in a row, and drove Bayou Road every day to and from his workplace. He was familiar with the road, and there is testimonial evidence from his parents that they had warned him of the dangers inherent in Bayou Road. Courteaux's father testified that his son was afraid to drive on Bayou Road. We find that an allocation of 25% fault to Courteaux's own inattentiveness and imprudence is the lowest percentage of fault that is reasonable under the circumstances of this case.

CONCLUSION AND DECREE
We find the trial court's decisions respecting the relative weight to be given to the various witnesses to have been within the exercise of its sound discretion. We find no manifest error in the trial court's assessment of damages. We find the allocation of 10% causative fault to plaintiff Courteaux to be manifestly erroneous and an abuse of the trial court's great, even vast, discretion. Therefore, we amend the judgment of the trial court to reflect that Courteaux's fault contributed 25% to the accident. Applying this allocation, the Courteaux judgment is apportioned 75% to the State and 25% to Courteaux. The Pelas judgment is apportioned 10% to Entergy, 22.5% to Courteaux and 67.5% to the State. We affirm the balance of the judgments of the trial court.
AMENDED IN PART AND, AS AMENDED, AFFIRMED.
NOTES
[1] See LSA-Const. Art. 5, section 10(B).