hBYRNES, C.J.,
dissents with reasons.
This is one of those cases “[w]here documents or objective evidence so contradict the witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness’s story, [and] the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination.” Rosell v. ESCO, 549 So.2d 840 (La.1989).
Additionally, the trial court erred in assigning the entire fault to the defendant-appellant because the plaintiff, as a left-turning motorist, is presumed liable for the accident, and he failed to carry his burden of proof to show that he was not at fault.
Plaintiff failed to carry his burden his burden of proof because the two eyewitnesses called to testify on behalf of the plaintiff, as well as the plaintiff himself, contradicted their prior statements and contradicted each other on basic issues important to the determination of credibility and liability. Their testimony is also contradicted by the only objective evidence offered at trial, pictures presented by the plaintiff of the damage to the two vehicles.
The plaintiff failed to overcome the presumption that as the left turning motorist he was responsible for the accident. Gibson v. Fisher, 401 So.2d 565 2(La.App. 3 Cir.1981). The burden rests heavily on the left-turning motorist to explain how the accident occurred and to show that he is free of negligence. Hughes v. Scottsdale Ins. Co., 35,043 (La.App. 2 Cir. 8/22/01), 793 So.2d 537; Severson v. St. Catherine of Sienna Catholic Church, 97-1026 (La.App. 5 Cir. 2/11/98, 707 So.2d 1026).
The defendant, Ms. Linders was a very poor witness who claimed to have virtually no recollection of what happened. However, as the burden of proof is on the plaintiff in general, in addition to which the plaintiff has the special burden in the instant case as an admittedly left turning motorist of overcoming the presumption that he is liable for the accident and explaining how the accident occurred, the plaintiff may not prevail merely on the weakness of Ms. Linders’ case.
The first of two purported eyewitnesses called by the plaintiff was Mr. Stanley Vincent. He testified that he was coming from a “washerette” at the time of the accident with Ms. Angel Cosse as a passenger in his truck:
Well, once I was traveling down there the car ran right in front of me and Pacific Street and I just said to myself, I said, “They must be going to put out a fire” because they would have hit me if I was — I was just pulling off from the dryer.
Mr. Stanley testified that Ms. Linders ran the stop sign, and was traveling in the parking lane/shoulder of the road at 45 to 50 miles an hour. He testified that the plaintiff had stopped and yielded first to oncoming traffic and when he had almost completed his turn, his vehicle was struck by Ms. Linders. When Ms. Linders vehicle was struck she veered to the right.
Mr. Stanley said that when the police officer arrived he told the officer he was a witness, but the police officer responded by telling him not to interfere with a police investigation, at which point Mr. Stanley walked off. He further testified to | soverhearing Ms. Linders admit to the plaintiff that she was at fault and that her insurance company would pay for the damage to plaintiffs automobile.
Mr. Stanley testified that Ms. Cosse remained in his truck. On cross-examination, Mr. Stanley said that he remained on the scene until the police arrived some 20 *94 to 30 minutes after the accident until the police left. At some point Ms. Cosse got out of the truck, but she remained by it. She did not walk over to examine the accident. Mr. Stanley was cross-examined further:
Q. After you left the scene did you [and Ms. Cosse] talk about the accident?
A. No, I just told her I seen it. I know I seen it.
Q. Did she ever tell you whether she had seen it?
A. No.
Upon further cross examination, it came out that at the time he gave his statement to the plaintiffs insurance company, when asked which lane Ms. Linders was driving in he responded, “Well, this is one lane.” He never mentioned the fact that she might have been driving on the shoulder or parking lane. When asked why he had stated that there were no other witnesses that he knew of, he explained that Ms. Cosse had not wanted to become involved.
Mr. Stanley was questioned further about what he and Ms. Cosse may have discussed:
Q. In the two years between [the] time of the accident and May of 1997 when you gave this statement, did you ever become aware that Angie Cosse had witnessed this automobile accident?
A. No, no.
Q. During that entire two year time this, 25-year friend of yours, you never actually talked about whether she saw the accident?
A. No ...
Upon further cross examination, it was shown that at three different points during the statement he had denied that anyone else was with him in his truck. He explained this by saying that he didn’t want to get Ms. Cosse involved.
LPlaintiffs attorney attempted to rehabilitate Mr. Stanley on redirect examination with the following series of leading questions:
Q. Mr. Vincent, were you simply mistaken as to whether or not on that particular occasion that you went to the washeteria on that Saturday, whether you were by yourself or you had other people with you?
A. Right. I picked her up later. So— Two years from now, what do you want me to remember?
Q. So do — What day of the week — do you remember what day of the week this incident occurred on?
A. It should have been a week — I’m only off every weekend. It should have been a week [day].
Q. And you go to the washeteria to do your clothes during the weekend?
A. On Saturday, right.
Q. On Saturday?
A. Right. I’m not. [sic]
Q. So, on a routine basis, do you usually go by yourself to do your laundry?
A. Right.
Q. You don’t take somebody else with you?
A. No. I mostly drive by myself.
Q. Okay. So it’s an unusual event that you would have someone with you on this particular Saturday, May 22nd of 1995?
A. Right.
Q. Some seven years and three months ago?
A. Right.
Q. So you simply made a mistake as to whether you were alone or had somebody with you?
*95 A. Right. All I did was picked her up and just she ran in there and see if they were ready, and that was it. And we came out.
Q. And your testimony is, you did know at the time of giving the statement whether or not she actually witnessed the incident. You told Mr. Cheatham to ask her himself?
A. Right.
Q. And you never discussed it up until the time of giving your statement?
A. No, I don’t — I mean, she lives a different way from me. I don’t have her number or nothing to call her.
Mr. Stanley further attempted to explain away the problems with his statement in response to further questioning by the plaintiffs attorney by saying that he was busy when he gave it and that it was not given under oath.
IsThe plaintiffs second witness, Ms. Angel Cosse, testified on direct that she was coming from a washeteria at the time of the accident, and that most of the time she went to the washeteria she went with Mr. Stanley Vincent the plaintiffs first witness. When asked what happened when she came into contact with Ms. Linders she responded:
She had ran a stop sign. She was going so fast she could have killed me. I was on that side.
She testified that Ms. Linders came from the passenger side of the vehicle in which Ms. Cosse was riding as a passenger in the front seat. She further testified that Ms. Linders was driving in the parking lane, “At least about 55, something like that,” on Opelousas Street which she thought had a posted speed limit of 20 or 25 miles per hour. When asked if she had seen Mr. Cheatham before Ms. Linders allegedly ran the stop sign, she responded:
No, I didn’t see him. I didn’t see him until after he had crossed over and she had hit him.
It was her opinion that had Ms. Linders not been going so fast she would not have struck the plaintiffs vehicle. After the accident she gave her name and phone number to the plaintiff but made no attempt to talk to the police officer in spite of the fact that she remained on the scene until he arrived. She said that she didn’t discuss the incident with Mr. Vincent because she didn’t know Mr. Cheatham and didn’t want to become involved. She said, when she was asked to become a witness some three years later she changed her mind.
Closer to the time of the incident she had apparently given a statement to Mr. Cheatham’s insurance company in which she expressed the opinion that the cause of the accident was the fact that Ms. Linders ran a stop sign and was speeding. On cross examination it came out that in that statement she said that Ms. Linders was driving in the middle, but at trial she said that what she probably meant was that Ms. Linders was in the traffic lane. But there is only one traffic |filane on Opelou-sas at that point. When asked why she had not told the claims adjuster that Ms. Linders was driving on the shoulder or the parking lane she replied:
Well ... it wasn’t important. None of it wasn’t [sic] important to me because it wasn’t me.
"When asked whether Ms. Linders vehicle had been struck in the front or the front side, she replied:
It looks like the front. I don’t remember.
However, she was cross-examined further on this issue:
Q. When they asked you where the damage on the Saturn [ (Ms. Lin- *96 der’s vehicle)] was, what did you tell them [in your statement]?
A. On the front side.
When asked where the plaintiffs vehicle had been struck, at the time she gave the statement she had said, “That it was messed up in the front.” At the time she gave the statement she had indicated that the vehicles had collided in the center of the intersection, which was not consistent with her statement that the collision had occurred in the parking lane or on the shoulder.
Ms. Cosse attempted to explain away the inconsistencies by saying that at the time she gave her statement, “that wasn’t important to me” and that she was busy. As this was the statement she gave to the plaintiffs insurance company we may safely assume that the claims adjuster did not attempt to suggest answers to her that would have been adverse to the interests of the insured, the plaintiff, Mr. Cheatham.
When it was pointed out to her in her statement that she had indicated that Mr. Vincent was a passenger in her vehicle, she attempted to explain by saying that, “I probably got it screwed up when they asked me. I wasn’t driving.” However, in the same statement she was able to give Mr. Vincent’s phone number and the time he normally got home from work.
|7The plaintiff, Daniel Cheatham, described the accident on direct examination as follows:
Once I got to Atlantic Street and Opel-ousas, I made a left, which I was going to go south. I got in the intersection. I stopped and then I yield. I looked to my right and I saw a truck, a blue truck, which was like two blocks down which gave me a lot of time. The truck was coming slowly. I was crossing over slowly. So, as I got over Atlantic side, that’s when I looked to my right and I was hit, severely hit and it sped my car.
The plaintiff explained that when he looked he saw Mr. Vincent’s truck at Elmi-ra Street but did not see the defendant’s car:
When I saw her, that’s when she came up the parked lane. That’s when she hit me, spinned [sic] my car around, and I could have got killed myself.
He estimated Mr. Vincent’s speed to have been, “About 10 to 15 miles per hour,” while he testified that he was executing his left turn at, “About ten miles an hour, just going across.” He then estimated Ms. Linders speed to have been about 60 miles per hour. When asked what parts of the vehicles collided, he responded:
It was her driver’s fender and it struck my passenger side, the right of my car, and it shifted the whole front.
Mr. Cheatham went on to testify that when his car spun around, Ms. Linder’s car struck the rear of his vehicle. He explained that the reason Ms. Linders was able to travel the two blocks from where he first saw Mr. Vincent before he could complete his turn was because of her very high rate of speed and because, while one of the blocks was 172 feet long, the other was an unusually short block of only 140 feet.
He testified that after the accident he got out of his car and asked Ms. Linders how she was doing. According to the plaintiff, Ms. Linders apologized and admitted that she was at fault. He testified that she also told him “that she had problems and [that] her mind drifted] off.”
|8On cross-examination, Mr. Cheatham testified that he was mistaken in his original statement that there was another car behind the truck. At the time of his deposition, Mr. Cheatham testified that the wit *97 nesses left before the police officer arrived and returned after he left. In his deposition he testified that he first talked to the witnesses after the police officer left:
I talked to Stanley Vincent — I’m correcting that. I talked to Stanley to Stanley Vincent at the accident. I talked with an officer. That officer told me to shut up, like he told him, and go to my car. That officer talked to Ms. Pamela Linders and some people she was with. He talked to them. And he told me that he didn’t want to hear anything I had to say... .[Emphasis added.]
When Mr. Cheatham gave a statement to his insurance company it does not reflect that he mentioned the presence of Stanley Vincent, but the plaintiff insisted that the informed his insurance company of that fact. On redirect he explained that he was trying to furnish the names of witnesses but was cut off.
An analysis of the foregoing review of the testimony of the plaintiff and his witnesses reveals the following problems:
Mr. Stanley’s Testimony:
1. It is very difficult to believe Mr. Stanley’s testimony that he never discussed the accident with Ms. Cosse, the alleged passenger in his vehicle, in spite of the fact that they both testified that the vehicle they were riding in was almost struck by the defendant’s vehicle and that they remained at the scene while the investigating officer was present.
2. It is very difficult to believe that the investigating officer was not interested in the fact that Mr. Stanley was a witness.
3. It is troubling that Mr. Stanley told the plaintiffs insurance adjuster that there were no other witnesses to the accident, when he testified at the trial that Ms. Cosse was a passenger |9in his vehicle. At three different points in his statement he denied that anyone else was with him in his truck.
4. It is troubling that he never mentioned to the plaintiffs insurance adjuster that Ms. Linder might have been driving on the shoulder/parking lane.
Ms. Cosse’s Testimony:
5. Ms. Cosse’s testimony that she did not discuss the accident with Mr. Stanley is very difficult to believe when she was a passenger in his vehicle, she remained at the scene while the investigating officer was there and she testified that she was on the side of the vehicle that Ms. Linders almost struck and felt that she could have been killed.
6. In her statement to the insurance company she stated that Ms. Linders was driving in the middle or traffic lane, but at trial she testified that Ms. Linders was driving on the shoulder/parking lane.
7. At the time she gave her statement to the plaintiffs insurance company she said that the collision occurred in the center of the intersection, but at trial she stated that it occurred on the shoulder/parking lane.
8. At the time she gave her statement she said that Mr. Vincent was a passenger in her vehicle, whereas as at trial she and Mr. Vincent both testified that the opposite was true.
*98 The Plaintiffs Testimony:
9. The plaintiff testified in his deposition that the witnesses left before the police officer arrived and returned only after he left.
|in10. Prior to trial the plaintiff stated that there was another car behind Mr. Vincent’s vehicle, but at trial he stated that there was no other car.
11. It is very difficult to believe that the investigating officer refused to speak to the plaintiff about the accident.
The physical damage to the vehicles contradicts the testimony of Cheatham and the eyewitnesses. Particularly, Cheatham testified that the Linders’ vehicle struck his passenger side, yet the photographs show damage to the entire front end of Cheatham’s vehicle. The photographs further show damage to only the driver’s side front fender on the Linders’ vehicle.
The trial judge stated on the record:
This is one of those cases where I can almost understand why it couldn’t settle. I have witnesses on both sides that can’t remember or don’t know what happened or changed their stories. After hearing the testimony in this case and reviewing the evidence in the difficult situation this is, the Court is going to find in favor of the plaintiff, Daniel Cheatham, and against the defendants, State Farm and Pamela Linders. The Court finds Ms. Linders 100 % at fault in causing the accident. [Emphasis added.]
While this Court should be slow to tamper with the findings of the trial court on factual issues, this is one of those cases where a review of the record as a whole[1] reveals so many inconsistencies and contradictions, inconsistencies and contradictions acknowledged by the trial court as troubling and problematic, that the trial court finding that the defendant was solely at fault is not supported by a preponderance of the evidence. The plaintiff has further failed to show that he was free from fault in view of the presumption of fault as the left-turning motorist.[2] In Accordingly, this Court should either reverse the trial court, or at the very least reallocate a significant percentage of the fault to the plaintiff.
If a reallocation of fault is determined upon rather than a complete reversal, then this Court should follow Riley v. Reliance Insurance Company, 97-0445, p. 6-7 (La.App. 4 Cir. 11/19/97), 708 So.2d 158, 163:
Thus Clement [v. Frey, 95-1119, 95-1163 (La. 1/16/96), p. 7-8, 666 So.2d 607], tells us that the allocation of fault is not an exact science, or the search for one precise ratio. Rather, it is an acceptable range and any allocation by the jury within that range cannot be “clearly wrong.” In Clement, the Supreme Court held that any allocation of fault falling between a ratio of 50/50 and 75/25 would be reasonable. This very broad range is illustrative of the analogy re *99 ferred to in the passage quoted above from Clement, comparing fault and quantum determinations, Youn v. Maritime Overseas Corp., 623 so.2d 1257 (La.1993), cert. denied 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), affords the factfinder “great even vast” discretion, the Clement analogy mandates this Court to afford considerable latitude to the trial court in matters of fault allocation.
Id.; Courteaux v. State ex rel. Dept. of Transp. and Development, 99-0353 (La.App. 4 Cir. 9/22/99), 745 So.2d 91.
Once it has been determined that the fact finder has abused her broad discretion in the allocation of fault, as was done in this case, consistent with the analogy drawn by Clement between the discretion of the fact finder in the fixing of general damages to the fact finder’s broad discretion in the allocation of fault, this Court is limited to determining the highest or lowest point within that discretion. The least amount of fault attributable to the plaintiff is 50%. Correspondingly, the greatest amount of fault attributable to the defendant is 50%.
liP.For the foregoing reasons, the judgment of the trial court should be reversed, but if not reversed, then amended to reallocate 50% of the fault to the plaintiff, Daniel Cheatham, and 50% of the fault to the defendant, Pamela J. Linders, and as amended, affirmed.

. Ambrose v. New Orleans Police Ambulance Serv., 93-3099 (La.7/5/94), 639 So.2d 216.

. Some other cases in which the trial court’s factual calls were found to be manifestly erroneous were: Cole v. Department of Public Safety, 01-2123 (La.9/4/02), 825 So.2d 1134; Perkins v. Entergy Corp., 00-1372 (La.3/23/01), 782 So.2d 606; Kelly v. Housing Authority of New Orleans, 02-0624 (La.App. 4 Cir. 8/14/02), 826 So.2d 571; Campora v. Falstaff, L.L.C., 01-2014 (La.App. 4 Cir. 6/12/02), 823 So.2d 389, writ denied, 2002-1918 (La. 10/25/02), 827 So.2d 1160; Royal v. Cottles, 97-1348 (La.App. 4 Cir. 1/7/98), 705 So.2d 1260.